**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| ALEX NELSON AND IRIS NELSON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF SAINT LOUIS, MISSOURI, | )   Cause No.: 4:18-cv-01561 |
| COL. GERALD LEYSHOCK, in his | ) |
| individual and official capacities, | )   JURY TRIAL DEMANDED |
| LT. SCOTT BOYHER, in his individual | ) |
| and official capacities, LT. TIMOTHY | ) |
| SACHS, in his individual and official | ) |
| capacities, SGT. RANDY JEMERSON, in | ) |
| his individual and official capacities, | ) |
| SGT. MATTHEW KARNOWSKI, in his | ) |
| individual and official capacities, | ) |
| SGT. BRIAN ROSSOMANNO, in his | ) |
| individual and official capacities, and | ) |
| JOHN DOEs #1-5, in their individual | ) |
| and official capacities. | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

On the night of September 17, 2018, Alex Nelson and his wife, Iris Nelson, were walking in their neighborhood. They left their condominium several hours after protests had damaged windows of local business. At no time were they engaged in any protests or illegal activity. At approximately 11:30 PM, St. Louis Metropolitan Police kettled, pepper sprayed, and assaulted the couple even though they were fully compliant and broke no laws.

## JURISDICTION AND VENUE

1.     Plaintiffs brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

2.     The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.     Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

6.     Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.     Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

8.     The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

9.      The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

10.      Gerald Leyshock is employed as a police officer with the SLMPD. Mr. Leyshock has the rank of lieutenant colonel. Mr. Leyshock was the incident commander during the events of September 17, 2017.

11.      Scott Boyher is employed as a police officer with the SLMPD. Mr. Boyher has the rank of lieutenant. Mr. Boyher was on the ground supervising SLMPD officers during the events of September 17, 2017.

12.      Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest.

13.      Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017.

14.      Matthew Karnowski is employed as a police officer with the SLMPD. Mr. Karnowski has the rank of sergeant. Mr. Karnowski was on the ground supervising SLMPD officers during the events of September 17, 2017. He declared the protests an "unlawful assembly" which SLMPD used as a predicate to the arrests and use of chemical agents.

15.      Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience

Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017.

16.     John Does #1-5 are as of yet unidentified police officers with the St. Louis Metropolitan Police Department. These unnamed defendants arrested Plaintiffs, used chemical munitions against Plaintiffs, beat Plaintiffs, prevented Plaintiffs from leaving the area, and unlawfully arrested Plaintiffs. Plaintiffs have been unable to identify these officers because the officers removed their name tags from their uniforms in violation of guidance promulgated by the U.S. Department of Justice and standard law enforcement practices. Further, the officers wore masks concealing their faces. But for their own actions, these officers could have been identified.

17.     Alex Nelson ("Mr. Nelson") is a Captain in the United States Air Force, who was stationed at Scott Air Force Base, Illinois. At the time of the event, he lived in Saint Louis, Missouri with his wife, Iris Nelson ("Mrs. Nelson").

### FACTS

#### A.     Backdrop of Stockley Verdict

18.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith. *See* Exh. A, Stockley Verdict.

19.     This acquittal shocked many in the St. Louis community as an audio recording submitted into evidence in the trial captured Officer Stockley saying "we're killing this motherfucker, don't you know" in reference to Mr. Smith. *Id*. at 5.

20.      Further, evidence showed that during the incident Officer Stockley was in possession of an assault rifle that had not been issued to him by the SLMPD. *Id*. at 23.

4

21.     In addition, Officer Stockley claimed to find a gun in Mr. Smith's car after he killed Mr. Smith. *Id*. at 25.

22.     Only Officer Stockley's DNA was found on the gun, leading many, including the Circuit Attorney of the City of St. Louis, to believe that Stockley planted the gun on Mr. Smith after Mr. Smith's death, in an effort to justify the killing. *Id*. at 12.

23.     At trial, Officer Stockley's partner did not testify in Stockley's defense. Rather, the partner invoked his Fifth Amendment right against self-incrimination.[1]

## B.     Protests Begin After the Verdict

24.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

25.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

26.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

27.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

28.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-

---

[1] *See* Joel Currier, *Partner of Ex-St. Louis Cop Charged with Murder is Given Immunity, Ordered to Testify*, St. Louis Post-Dispatch, Jul 27, 2016, available at http://www.stltoday.com/news/local/crime-and-courts/partner-of-ex-st-louis-cop-charged-with-murder-is/article_b85140b8-3744-55fb-83ee-3d9474cc70b3.html.

Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

29.     Virtually all of the protests were non-violent.

30.     On three occasions, a handful of protesters committed minor property damage, including broken windows and broken flower pots.

31.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

     a.     The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

     b.     The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

     c.     The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

     d.     The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

     e.     The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

     f.     The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

     g.     The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.      The evening of Friday, September 15, 2017, on Hortense Place.

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

32.     These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

### C.      Post-Ferguson Federal Court Proceedings

33.     On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

      (a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
      (b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;
      (c)     without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
      (d)     without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)     utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Dec. 11, 2014) at 3.

34.     This suit was in response to SLMPD firing chemical agents into a business where peaceful protestors had congregated without allowing the protestors to leave.

35.     The City entered into a settlement agreement on March 25, 2015, where it agreed

as follows:

A.     Defendants and their agents, servants, employees, and representatives, will
not enforce any rule, policy, or practice that grants law enforcement officials the authority
or discretion to:
      (1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents
(collectively, "chemical agents") for the purpose of dispersing groups of
individuals who are engaged in non-criminal activity:

        (a)     without first issuing clear and unambiguous warnings that
such chemical agents will be utilized;
        (b)     without providing the individuals sufficient opportunity to
heed the warnings and exit the area;
        (c)     without reasonably attempting to minimize the impact of
such chemical agents on individuals who are complying with lawful law
enforcement commands; and
        (d)     without ensuring that there is a means of safe egress from the
area that is available to the individuals and announcing this means of egress
to the group of individuals.

      (2)     utilize chemical agents on individuals engaged in non-criminal
activity for the purpose of frightening them or punishing them for exercising their
constitutional rights.

B.     Provided, however, that Paragraph A hereof shall not be applicable to
situations that turn violent and persons at the scene present an imminent threat of bodily
harm to persons or damage to property, and when law enforcement officials must defend
themselves or other persons or property against such imminent threat.

*See* Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar. 25,

2015) at 1-2.

### D.     SLMPD Violations of the Consent Decree

36.     Less than two months after entering into this Consent Decree, SLMPD began to

violate the Decree.

37.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's

office's refusal to charge another SLMPD officer for killing another African-American man,

SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without

warning. *See* Exh. D, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 69.

38.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *Id.* at 50-52. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id.* SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *Id.* Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

39.     On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. *Id.* at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

### E.     The Buildup to the Kettling on September 17, 2017

40.     This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

41.     According to Defendant Rossomanno, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flower pots on the 900, 1000,

and 1100 blocks of Olive Street in downtown St. Louis. *See* Exh. E, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 188.

42.     There is no evidence nor allegations that Plaintiffs were in any way involved in this destruction of property.

43.     Defendant Rossomanno also testified that at approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions." *See* Exh. F, Rossomanno Declaration, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 12, 2017), Doc. 33-6 at 4.

44.     Defendant Rossomanno testified that a second dispersal order was given at 8:51 PM. *Id.* at 5.

45.     Plaintiffs were not present for these alleged dispersal orders.

46.     Although Defendant Sachs heard some sort of order being given, he testified that he could not make out "exactly what was being said." *See* Exh. E at 25.

### F.     The Kettling

47.     Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

48.     Defendant Karnowski testified that he and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. *See* Exh. E at 125-126. He also testified that he determined that the protest that evening was an "unlawful assembly." *Id*. at 136-137.

49.     This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

50.     Defendant Sachs came up with the plan to arrest everyone present. *See* Exh. E at 27. He presented his plan to Defendant Leyshock, who approved the plan. *Id*. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard. *Id.* at 27-40.

51.     At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

52.     This was nearly three hours after the windows and flower pots were broken and many blocks away from the damaged businesses.

53.     SLMPD's Civil Disobedience Team appeared at the scene.

54.     A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

55.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

56.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

57.     All three of these lines were comprised of officers all wearing military-like tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

58.     A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

59.     These officers were carrying bicycles and were being directed by Defendant Boyher. *See* Exh. E at 30-31.

60.     Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

61.     Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

62.     As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

63.     As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, the officers blocked anyone from leaving the area.

64.     Video evidence shows multiple citizens approaching officers and requesting to be let past. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!" *See* Exh. G.

65.     In addition, the closing phalanxes of officers cut off access to all alleys and other means of egress.

66.     As the four lines closed, they trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

67.     This is a law enforcement tactic known as "kettling."

68.     The SLMPD police officers kettled self-admitted protestors, residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, a homeless person, and an even an undercover SLMPD officer.

69.     Video evidence even shows the officers grabbing an African-American male who was outside of the kettle and throwing him into the kettle.

12

70.     As the kettle closed, video evidence shows many individuals approaching the officers and begging to pass.

71.     Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

72.     Video evidence shows individuals peacefully approaching the bicycle officers with their hands up.

73.     In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

74.     Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

75.     Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

76.     Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

77.     Many were kicked, beaten, and dragged.

78.     Upon information and belief, an undercover African-American SLMPD police officer who was at the intersection was arrested and beaten by other SLMPD police officers merely for being inside the kettle.

79. Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

80. Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

81. In response, SLMPD officers roughly removed the goggles and then sprayed some of those individuals directly in the face.

82. At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

83. These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

84. SLMPD officers using hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

85. Over 100 people were arrested that night.

86. During and after the arrests, SLMPD officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

87. That evening, the following celebratory picture was posted on Twitter by an anonymous person:



SLMPD CDT Team welcomes protesters. See More

88.     By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendants.

### G.     The Police Department Intentionally Ignored Its Own Policies

89.     When detaining individuals in custody who require medical care, the City of St. Louis and its SLMPD has established the following policy:

<u>PRISONERS REQUIRING MEDICAL ATTENTION</u> (72.6.1)

1.     A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2.     Should a prisoner require <u>emergency</u> medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary

conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

3.      Should a prisoner require <u>non-emergency</u> medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.

4.      The confidential relationship of doctor and patient extends to prisoner patients and their physician.

5.      In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If practical, the photos should be taken both prior to the application of bandages, etc., and after the injury has received appropriate medical attention

<u>PRISONER HEALTH SCREENING</u> (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded on the Field Booking Form when prisoners are booked and verified upon their transfer to another facility or release:

1.      Current health and medical history of the prisoner; (72.6.3.a)
2.      Medication taken by the prisoner; (72.6.3.b)
3.      Known medication/drug allergies;
4.      Behavior, including state of consciousness and mental status; and (72.6.3.c)
5.      Body deformities, trauma markings, bruises, lesions, jaundice (a yellowness of the skin and whites of the eyes), and ease of movement (72.6.3.d)

<u>NOTE:</u>  a copy of the Field Booking Form **must** be attached to the computerized Arrest Register whenever a prisoner is transferred to the City Justice Center.

90.     On information and belief, the SLMPD and City of St. Louis Correctional Staff failed and/or refused to follow this policy when they provided no medical care to any of the people illegally pepper sprayed or who.

91.     Defendants' decision to ignore the policy constitutes a custom and practice of failing and/or refusing to follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiffs and other injured detainees.

16

92.     Despite this policy, at no time between their arrest and their release from the St. Louis City Justice Center did any police officer or other city official provide any arrestee with medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

### H.      Arrest and Charges of Kettling Victims

93.     Upon their release, all of the arrestees were given summonses showing that they had been charged with "failure to disperse." They were instructed to appear at St. Louis City Municipal Court on October 18, 2017.

94.     They were charged as such even though SLMPD officers provided no means of egress, denied repeated requests to be allowed to leave, and kettled the individuals.

95.     In at least one case, a person was thrown from outside of the kettle into the kettle by SLMPD and was subsequently arrested for failure to disperse.

96.     The press release stated "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob. Multiple businesses also sustained property damage and one officer suffered a serious injury."

97.     Egregiously and in an attempt to further punish its victims, SLMPD publicly released the addresses of the arrestees.

98.     The video evidence, as the federal court observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area" – much less a mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by SLMPD.

99.     SLMPD used its Twitter account to disseminate this false statement to its approximately 70,000 followers. SLMPD subsequently deleted the tweet.

100.    During a preliminary injunction hearing, attorneys representing the City stated that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is justified in declaring an unlawful assembly and then deploying chemical agents regardless of the proximity of the target individuals in time or space to the property damage and regardless of if the people were engaged in criminal activity. According to the City, officers are justified to use chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

101.    On October 13, 2017, the St. Louis City Counselor's office issued a letter stating "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges." *See* Exh. H.

## I.    Federal Court Injunctive Relief

102.    On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Exh. I, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

103.    The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest

because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

104.    The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM" *Id*. at 9.

105.    The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but the "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id*. at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id*. at 8-9.

106.    The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

107.    The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a large crowd congregating in the streets" and "(n)o violent activity by protesters can be observed on the video." *Id.* at 10. In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

108.    The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12. The Court found that no audible warning could be heard on the video. *Id.*

109.    The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

110.    In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id*. at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

111.    The Court made the following findings:

a.    Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id*. at 35-36.

b.    Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

c.    Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to**

**officers or property in this mixed commercial and residential area**. *Id*. at 37. (Emphasis added).

d.      Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id*.

e.      Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

f.      Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

g.      Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

h.      Plaintiffs have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id*. at 42.

i.      The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

j.      Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in

retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. 44.

      k.    Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id*. 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id*. 44-45.

112.    Upon information and belief, senior officials of the SLMPD, including Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

## ALLEGATIONS (SPECIFIC)

113.    Mr. Nelson and Mrs. Nelson (collectively referred to as "the Nelsons") lived together in the area of Washington Avenue and Thirteenth Street in St. Louis.

114.    On the evening of September 17, 2017, the Nelsons were at home at their located one block west of Washington Avenue and Tucker Boulevard.

115.    At approximately 9:00 PM, the Nelsons heard a commotion outside of their window. They went downstairs and observed people running and others yelling that the police were arresting and pepper spraying people.

116.    The Nelsons went back inside and went to their rooftop to observe what was going on. They stayed on the rooftop for approximately 45 minutes.

117.    Once it looked like the area had been calm for a while and after they observed all of the police leaving the area, the Nelsons went downstairs to explore their neighborhood and see what had happened.

118.    The Nelsons were not participating in the protest and did not ever join any protests. In fact, they never saw any protests that occurred in the Washington Avenue area that evening.

119.    Eventually, they came to the area of Locust Street and Tucker Boulevard, observing a group of people from the sidewalk who looked like they may have been protesting earlier in the evening.

120.    The Nelsons heard the police order these individuals to go either west on Locust Street or north on Tucker Boulevard.

121.    While the Nelsons did not believe the order applied to them, they moved north on Tucker Boulevard, as that was the direction of their home.

122.    When the Nelsons reached Washington Avenue, they turned west to walk home.

123.    The Nelsons did not hear any further police warnings or orders to disperse.

124.    When the Nelsons were approximately eighty feet from their house, they observed a line of police. These police did not allow the Nelsons to go home. In fact, the police ordered the Nelsons to walk in the opposite direction.

125.    As the Nelsons moved east on Washington Avenue toward Tucker Boulevard, they noticed that police had blocked off both streets in every direction.

126.    The Nelson eventually ended up at the northeast corner of Washington Avenue and Tucker Boulevard with a large group of peaceful and compliant people.

24

127.    While at that corner, the Nelsons were suddenly, and without warning, surrounded by a group of police in riot gear.

128.    The Nelsons were surrounded on all four sides. Without prompting the voluntarily git on the ground.

129.    Upon seeing the situation, Mr. Nelson deduced that he and his wife were going to be arrested. He told his wife to lie face down and put her hands behind her back. He did the same. The reason he took these actions is that as a military officer he was trained on the proper way to arrest a suspect and the safest way for the suspect to place himself in a compliant position to be handcuffed.

130.    Even though the Nelsons had broken no laws and had placed themselves on the ground in a fully compliant manner, Defendants began to pepper spray them indiscriminately.

131.    Mrs. Nelson was pepper sprayed and suffered pain and burning to her face, hands, and arms. She temporarily lost sight in her right eye. After her arrest and during her incarceration, she was denied any help wiping the painful pepper spray off.

132.    Mrs. Nelson was handcuffed with zip ties and led away from the crowd over to the transport van.

133.    The officer leading Mrs. Nelson twisted her arms with excessive force even though Mrs. Nelson was being completely compliant.

134.    Mrs. Nelson also informed the arresting officer that Mrs. Nelson was a neighborhood resident and was merely walking around the neighborhood.

135.    When Mrs. Nelson asked why she was being arrested, the officer would not tell Mrs. Nelson and said that he did not care that she lived in the area.

136.    Mr. Nelson tried to explain to his arresting officer that he was not a protestor, lived in the area. Mr. Nelson offered to show the officer his identification. Rather than listen, the officer told Mr. Nelson that he (the officer) did not care.

137.    Mrs. Nelson observed many police officers high fiving each other, smoking cigars in celebration, and chanting about their "victory" in beating and arresting people that night. Several officers even took celebratory selfie on their personal phones with the arrestees.

138.    Immediately after the initial pepper spray, a police officer lifted Mr. Nelson's head up so that officer could spray pepper spray directly into Mr. Nelson's eyes from point blank range. As a result, Mr. Nelson could not see for several hours.

139.    The Officers injured caused Mr. Nelson's head, arm, knee, and body. The Officers dragged Mr. Nelson, injuring his face, arm, and shoulder. Mrs. Nelson witnessed Mr. Nelson being drug across the street by multiple officers. The force of the dragging destroyed Mr. Nelsons footwear.

140.    Once officers violently zip tied Mr. Nelson's hands behind his back, an officer laughed at him, taunting, "You like that, cocksucker. It's ok, we'll see you out here tomorrow night."

141.    Officers took the Nelsons to the St. Louis City Justice Center and put them in holding cells.

142.    Mr. Nelson was the last person called out of his cell to have his restraints removed. His hands were restrained for approximately three to four hours. Still to this date, nearly a year later, he does not have full feeling in his right hand.

143.    Mr. Nelson was denied any opportunity to call his chain of command at Scott Air Force Base to tell them he would not be able to go to work on September 18, 2017.

144.   Mr. Nelson was detained until 5:30 PM on September 18, 2017.

145.   Mrs. Nelson was detained until 9:30 PM on September 18, 2017.

**COUNT I**
**42 U.S.C. § 1983- Fourth and Fourteenth Amendment Violations: Unreasonable Seizure**
**(Against All Defendants)**

146.   Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

147.   Defendants did not have probable cause to arrest Plaintiffs.

148.   Defendants unreasonably seized Plaintiffs, thereby depriving Plaintiffs of Plaintiffs' right to be free from unreasonable seizure of Plaintiffs' person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

149.   Further, there was no objectively reasonable belief that Plaintiffs had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the seizure was unreasonable.

150.   Plaintiffs were unreasonably seized when Defendants terminated Plaintiffs' freedom of movement by use of kettling.

151.   Defendants' use of kettling without providing warning to Plaintiffs was an unreasonable seizure. As a direct result of the conduct of Defendants described herein, Plaintiffs suffered physical injury and emotional trauma.

152.   Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs were damaged.

153.   At all times, Defendants were acting under color of state law.

154.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II
**First Amendment Retaliation - Cognizable Under 42 U.S.C. § 1983**
**(Against All Defendants)**

155.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    Plaintiffs have a fundamental right to assemble and express her views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

157.    Defendants' actions violated Plaintiffs' rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs' ability to associate freely in public and express Plaintiffs' views as part of a peaceful demonstration.

158.    Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

159.    Defendants' actions violated Plaintiffs' First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiffs' ability to gather information and cover a matter of public interest.

160.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' First Amendment rights.

161.    As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiffs suffered damages including: physical injury, emotional trauma, great concern for

Plaintiffs' own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

162.    Additionally, Defendants' actions described herein have had a chilling effect on Plaintiffs, who are now less likely to participate in free public discourse.

163.    At all times, Defendants were acting under color of state law.

164.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT III
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
### (Against Defendants Doe Police Officers)

165.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

166.    Plaintiffs have a fundamental right to assemble and express Plaintiffs' views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

167.    Defendants' actions violated Plaintiffs' rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs' ability to associate freely in public and express Plaintiffs' views as part of a peaceful demonstration.

168.    Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

169.    Defendants' actions violated Plaintiffs' First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiffs' ability to gather information and cover a matter of public interest.

170.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' First Amendment rights.

171.    As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiffs suffered damages including: physical injury, emotional trauma, great concern for Plaintiffs' own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

172.    Additionally, Defendants' actions described herein have had a chilling effect on Plaintiffs, who are  now less likely to participate in free public discourse.

173.    At all times, Defendants were acting under color of state law.

174.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**Unlawful Retaliation in Violation of The First Amendment**
**Cognizable Under 42 U.S.C. § 1983**
**(All Defendants)**

175.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

176.    Plaintiffs were engaged in lawful First Amendment conduct of free speech and assembly.

177.    In retaliation for this exercise of Plaintiffs' First Amendment rights, Defendants kettled Plaintiffs, deployed chemical agents against Plaintiffs, assaulted Plaintiffs, and seized Plaintiffs.

178.    Without probable cause or arguable probable cause, and in retaliation for Plaintiffs' exercise of First Amendment rights, Defendants arrested and initiated charges against Plaintiffs.

179.    Defendants' conduct of kettling, use of chemical agents, assault, seizure, arrest, and initiation of charges that would chill a person of ordinary firmness from continuing to engage in lawful First Amendment activity of free speech and assembly.

180.    Defendants acted in retaliation against Plaintiffs, and for the purpose of deterring Plaintiffs from exercising Plaintiffs' rights under the First Amendment to free speech and assembly.

181.    The conduct of Defendants violates the First Amendment in the United States Constitution in that Defendants deprived Plaintiffs of Plaintiffs' right to free speech and assembly by acting in retaliation against Plaintiffs for the purpose of deterring Plaintiffs from engaging in lawful protests.

182.    As a direct and proximate result of the conduct of Defendants, Plaintiffs suffered injuries and damages including but not limited to: physical injury, emotional trauma, great concern for Plaintiffs' own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; suppression of their First Amendment right to freedom of speech and assembly, punishment for exercising Plaintiffs' First Amendment rights; and loss of faith in society.

183.    The acts of Defendants described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Plaintiffs, thus entitling Plaintiffs to an award of punitive damages against Defendants.

184.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

<u>COUNT V</u>
**42 U.S.C. § 1983-Conspiracy to Deprive Civil Rights**
**(Against All Defendants)**

185.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

186.    Defendants, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiffs' civil rights.

187.    In furtherance of this conspiracy, Defendants committed the following overt acts:

a.    Defendants, acting in concert, kettled and unlawfully seized Plaintiffs. They detained Plaintiffs' in the City Justice Center for approximately 22 hours.

b.    Defendants used excessive force by tying Plaintiffs' hands in the zip-cuffs.

c.    Defendants used excessive force by deploying chemical agent against Plaintiffs.

d.    Defendants assaulted Plaintiffs.

e.    Defendants initiated charges against Plaintiffs that would chill a person of ordinary firmness

188.    As a direct and proximate result of the conspiracy between Defendants and others as described above, Plaintiffs were subjected to assault; the use of excessive force; the deprivation of the right to be free from unreasonable search and seizure; and malicious prosecution.

189.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered and will continue to suffer physical pain and injury and emotional trauma.

190.    The acts described herein were intentional and callously indifferent to the rights of Plaintiffs, thus entitling her to an award of punitive damages against the Defendants.

191.    At all times, Defendants were acting under color of state law.

192.    If Plaintiffs prevail, Plaintiffs are entitled to recovery attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT VI**
**42 U.S.C. § 1983: Municipal Liability**
***Monell* Claim against Defendant City of St. Louis for Failure to Train, Failure to Discipline, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force**

193.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

194.    Defendant City is liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for the other Defendants' violation of Plaintiffs' rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiffs are the following:

a.    SLMPD officers' routinely use of excessive force when policing protests, especially those at which police brutality is being protested;

b.    SLMPD custom or policy of using kettling without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

c.    SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

d.    SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

33

e.      Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

195.    Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of kettling and use of force.

196.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiffs as alleged herein.

197.    As a direct result of the Defendant City's failures and policies as described herein, Plaintiffs suffered damages including: physical injury, fear, apprehension, and concern for Plaintiffs' own safety.

198.    If Plaintiffs prevail, Plaintiffs are entitled to recovery attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count VII
### Missouri State Law § 565.056: Assault in the Fourth Degree
### (Against Defendant Doe Police Officers 1-5)

199.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

200.     The use of kettling, without warning and without a way to egress, caused Plaintiffs to experience apprehension of immediate physical injury.

201.    The brandishing and deployment of chemical agents for no lawful reason by Defendant Doe Police Officers 1-5 caused Plaintiffs to experience apprehension of immediate physical injury.

202.    The arrest of Plaintiffs by Defendant Doe Police Officers 1-5, without explanation, and the place of Plaintiffs' hands in zip-cuffs purposely placed Plaintiffs in apprehension of immediate physical injury.

203.    As a direct result of the conduct of Defendant Doe Police Officers 1-5 described herein, Plaintiffs suffered damages including: apprehension, fear, concern for Plaintiffs' own safety, and physical injury.

204.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

205.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

206.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

207.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VIII
### Missouri State Law: False Arrest
### (Against All Defendants)

208.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

209.    Plaintiffs were arrested without any legal justification or probable cause by Defendant Does.

210.    Defendant Does proceeded to constrain and confine Plaintiffs against Plaintiffs' free will. There was no lawful justification for Defendants restraining and confining Plaintiffs in the above manner.

211.    As a direct result of the conduct of Defendants described herein, Plaintiffs suffered damages including: physical injury, fear, apprehension, and emotional trauma.

212.    The actions of Defendants as described above were carried out in bad faith and with malice, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT IX
### Missouri State Law: False Imprisonment
### (Against All Defendants)

213.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

214.    Defendants intentionally restrained and confined Plaintiffs against Plaintiffs' will when they took Plaintiffs into custody and detained Plaintiffs.

215.    Plaintiffs did not consent to Defendants' actions in removing and confining Plaintiffs in the manner described above, nor in any manner whatsoever.

36

216.    There was no lawful justification for Defendants to restrain and confine Plaintiffs in the manner described above.

217.    Defendants held Plaintiffs in confinement for a substantial period of time, spanning several hours.

218.    As a direct and proximate result of her false imprisonment by Defendants, Plaintiffs suffered damages including: physical injury, emotional trauma, great concern for her own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

219.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

220.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

221.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

222.    Defendants' actions in causing the false imprisonment of Plaintiffs, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiffs' rights, thereby entitling her to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

## COUNT X
### Missouri State Law: Abuse of Process
### (Against All Defendants)

223.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

224.    Defendants made an illegal, improper, and perverse use of process by arresting, charging, and detaining Plaintiffs without any legal justification or probable cause in order to harass and intimidate Plaintiffs, which constitutes an improper collateral purpose.

225.    Defendants acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, in that Defendants used legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

226.    As a direct and proximate result of Defendants' abuse of process, Plaintiffs suffered damages including: emotional trauma, great concern for her own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

227.    Defendants' abuse of process, as described above, was carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiffs' rights, thereby entitling Plaintiffs to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

## COUNT XI
### Missouri State Law: Malicious Prosecution
### (Against All Defendants)

228.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

229.    Defendants assisted in the filing of charges against Plaintiffs with no probable cause that Plaintiffs had committed a crime or ordinance violation.

230.    Such charges were subsequently dismissed against Plaintiffs. As a direct result of the conduct of Defendants described herein, Plaintiffs suffered damages including: physical injury, emotional trauma, great concern for Plaintiffs' own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

231.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

232.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

233.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

234.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT XII

### Missouri State Law: Intentional Infliction of Emotional Distress
### (Against All Defendants)

235.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

236.     By surrounding, assaulting Plaintiffs, spraying Plaintiffs in the face at point-blank range with a chemical agent, and arresting Plaintiffs without probable cause, Defendants committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

237.     Defendants' actions were intentional or, at best, reckless.

238.     Such actions by Defendants have caused Plaintiffs severe emotional distress that has resulted in bodily harm, as described above.

239.     Defendants' sole motivation was to cause emotional distress to Plaintiffs and the other people Defendants' unlawfully arrested.

240.     As a direct result of the conduct of Defendants described herein, Plaintiffs suffered damages including: physical injury, emotional trauma, great concern for her own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

241.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

242.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he

PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . ..”

243.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

244.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

### COUNT XIII
**Missouri State Law: Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

245.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

246.    Alternative to Count XI, above, by surrounding Plaintiffs, assaulting Plaintiffs, spraying Plaintiffs with pepper spray in the face at point-blank range, and arresting Plaintiffs without probable cause, Defendants realized or should have realized that their conduct posed an unreasonable risk to Plaintiffs.

247.    Further, Plaintiffs were reasonably in fear for his own person because of the actions of Defendants and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

248.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

249.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

250.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

251.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT XIV
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against Defendants Doe Police Officers)

252.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

253.    Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiffs' Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs were damaged.

254.    The use of force against Plaintiffs, by inflicting harm through use of zip-cuffs applied to Plaintiffs' wrist, was objectively unreasonable.

255.    The use of kettling, without warning, was objectively unreasonable and constituted excessive force.

256.    The use of pepper spray was objectively unreasonable and constituted excessive force.

257.    As a direct result of the conduct of Defendants described herein, Plaintiffs suffered physical injury and emotional trauma.

258.    At all times, Defendants were acting under color of state law.

259.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

<u>**COUNT XV**</u>
**Missouri State Law: Battery**

260.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

261.    During the process of being unconstitutionally arrested, Plaintiffs suffered battery at the hands of Defendants.

262.    Namely, Defendants' physically aggressive tactics caused intentional and offensive bodily harm to Plaintiffs.

263.    In spraying Plaintiffs directly in the face with pepper spray — when Plaintiffs were already attempting to comply with Defendants' directives — caused further intentional and offensive bodily contact.

264.    As a direct result of Defendants' conduct described herein, Plaintiffs suffered damages including: physical injury, emotional trauma, great concern for her own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

265.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

43

266.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

267.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

268.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiffs pray for judgment in favor against all Defendants for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.


Dated: September 17, 2018                    **Respectfully submitted,**

                                             KHAZAELI WYRSCH LLC

                                             /s/ James R. Wyrsch
                                             James R. Wyrsch, MO53197
                                             Javad Khazaeli, MO 53735
                                             Kiara Drake, MO 67129
                                             911 Washington Avenue, Suite 211
                                             Saint Louis, MO 63101
                                             (314) 288-0777
                                             (314) 400-7701 (fax)
                                             james.wyrsch@kwlawstl.com
                                             javad.khazaeli@kwlawstl.com
                                             kiara.drake@kwlawstl.com

ARCHCITY DEFENDERS, INC.

Blake A. Strode (MBE #68422MO)
Michael-John Voss (MBE #61742MO)
Nathaniel R. Carroll (MBE #67988MO)
Sima Atri (MBE #70489MO)
John M. Waldron (MBE #70401MO)
440 N. 4th St., Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1021
314-925-1307 (fax)
bstrode@archcitydefenders.org
mjvoss@archcitydefenders.org
ncarroll@archcitydefenders.org
satri@archcitydefenders.org
jwaldron@archcitydefenders.org

Attorneys for Plaintiffs