**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEX and IRIS NELSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:18-cv-01561 (JCH) |
| | ) | |
| CITY OF SAINT LOUIS, MISSOURI, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE TO DEFENDANTS' OPPOSITION**
**TO MOTION FOR CONTINUED JOHN DOE DISCOVERY**

Defendants oppose Plaintiffs' request to extend John Doe discovery. *See* Doc. 100. In their

opposition, Defendants do not cite a single precedential case supporting their position that John

Doe discovery should cease. In addressing the case that governs this matter and allows for

continued discovery, Defendants wrongly claim that the court's discussion of John Doe discovery

is merely dicta. *See Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985). Further, Defendants'

description of their supposed cooperation would be laughable if it had not caused unnecessary

delays in this matter and 11 other similar situated cases before judges in this district. This Court

should extend the John Doe discovery period and hold Defendants to their discovery obligations.

**I.      Discovery History**

Defendants claim they have "cooperated diligently and fully with Plaintiffs' John Doe

discovery demands to date." Doc. 100 at 2. They further claim that Sgt. Charles Wall "has been

functioning almost full time as an aide to defense counsel in investigating and responding to

discovery in this and companion cases." *Id*. Defendants also claim that "Plaintiff does not mention

that, in the course of the litigation of this and companion cases, erstwhile John Doe defendants

have been identified in discovery." *Id.* at 3. Finally, in a related case where Defendants petitioned

1

the court to vacate its order extending John Doe discovery, Defendants made the outrageous claim that Plaintiffs filed a motion that contained "incomplete, misleading and, in part, false information." *See* Doc. 98 at 2, *Nelson et al. v. City of St. Louis,* No. 4:18-cv-1561-JCH (E.D. Mo. Nov. June 2, 2020) (emphasis added).[1] As detailed below, Defendants' misrepresentations of the history of discovery in this matter is endemic of their attempts to obfuscate and dodge liability.

The one thing upon which Plaintiffs and Defendants agree is that Defendants executed a haphazard plan to kettle and arrest Plaintiffs and other citizens. Defendants state, "[i]t should not be surprising, however, that there would be lapses in procedure during an extemporized mass arrest." *See* Doc. 100 at 6. While the degree of surprise is questionable, we are heartened that, nearly two and half years later, Defendants admit that they violated their own policies.

Defendants claim Sgt. Wall "has been functioning almost full time as an aide to defense counsel in investigating and responding to discovery in this and companion cases" *Id*. at 3. This assertion is contradicted by Sgt. Wall's deposition testimony where he stated, since at least November 2019, he was not working for the City Counselor's full-time: "I wouldn't say it's my full-time role at this time, no…I'm assigned to the Police Commissioner's Office and I have other administrative tasks and duties…I still work with the City Counselor's Office. It's one of my duties. But it's not my sole duty at this time, no." *See* Exh. A, Transcript of Deposition of Charles

---

[1]     In a related case where Defendants petitioned the court to vacate its order extending John Doe discovery, Defendants made the outrageous claim that Plaintiffs' counsel drafted a motion that contained "incomplete, misleading and, in part, false information." *See* Doc. 98 at 2, *Gullet v. City of St. Louis,* No. 4:18-cv-1561 (E.D. Mo. Nov. June 2, 2020. Plaintiffs' counsel takes accusations of lying to the Court seriously. In Defendants' subsequent filings, they neither withdrew this allegation nor provided any evidence of this unsubstantiated malfeasance Defendants' Opposition is bereft of any claims of Plaintiffs misleading this Court or making any false statements. Once again, Defendants rely on bluster to distract from their utterly deficient "investigation" into the John Doe identities.

Wall at 150:6 – 20. Regardless of whether Sgt. Wall worked exclusively for the City Counselor's office before November 2019, his testimony established that he was not full-time during any of the period he was designated as the City's 30(b)(6) designee from January to May 2020. Sgt. Wall, when asked what he had done in the two months prior to the 30(b)(6) deposition, responded "**(i)n the last months, I --- I haven't done nothing** (sic)." *Id.* at 50:18 – 22 (emphasis added).

Plaintiffs' counsel has only spoken to Sgt. Wall one time, during a deposition for the limited purpose of identifying John Doe defendants. Sgt. Wall's deposition was less than a month ago, on May 15, 2020, 14 days before the John Doe discovery deadline and the court-imposed deadline to amend the complaint. *Id.* The deposition was first noticed in January 2020 but continued numerous times, first in order to negotiate over the 30(b)(6) topics and then because of the COVID-19 shutdown. Defendants had four months to prepare for this deposition.

To better facilitate the identification of the John Does, Plaintiffs served interrogatories asking Defendants to specifically identify the SLMPD officers who interacted with Plaintiffs and included screenshots and photos to highlight Plaintiffs' location amongst the other arrestees and highlight the officers for whom Plaintiffs seeks identification. Defendants responded to those interrogatories without identifying most John Doe defendants. Plaintiffs' also produced 40 video clips and almost 100 photos to aid in Defendants' investigation and preparation for the 30(b)(6) deposition by establishing exactly where specific SLMPD officers can be seen interacting with Plaintiffs in the available documentation. Plaintiff offered on numerous occasions to provide more information, if needed, about the video clips and pictures in order to assist the 30(b)(6) deponent with their investigation. Defendants never took Plaintiffs up on the offer.

Defendants have produced a list of 96 officers that Sgt. Wall interviewed in preparation for the deposition. Unbelievably, Sgt. Wall did not bring to the deposition any notes from the nearly

3

100 interviews he conducted. *Id.* at 98:6 – 99:25. Rather than bring the records, Sgt. Wall chose to answer questions about the nearly 100 interviews and dozens upon dozens of hours of video review from his memory. He also admitted "the vast majority of people that I've spoken with have been long before this. This deposition was originally scheduled to occur kind of as it coincided with the beginning of all of this. So by and large, I was mostly prepared before. But since the time of, you know, late February, early March, I haven't had any face-to-face meetings with anyone." *Id*. at 88:1 – 7.

This may explain why he was woefully unprepared to identify the still unknown John Does and answer questions that would allow Plaintiffs to further investigate the matter. It defies credulity to expect a person to remember the details of nearly 100 interviews conducted at least three months earlier—likely much earlier—without referring to any notes. For a trained law enforcement officer to conduct his "investigation" in this manner may explain why, nearly two and half years after the filing of this case, John Does remain.

Sgt. Wall stated that he could not identify SLMPD officers in pictures or videos no less than 85 times over the course of the deposition. On at least 51 occasions, Sgt. Wall, a 30(b)(6) witness, responded with "I don't recall," "I can't recall," or some variation, when asked about the details of his interviews. Sgt. Wall could not even recall whether he showed the pictures and videos Plaintiffs produced to specific officers he interviewed.

> 13    Q (By Mr. Wyrsch) And sitting here today, you
> 14    can't tell me which officers you showed this to in
> 15    order to try to identify who that is?
> 16    A Correct.

*Id*. at 103:13 – 16.

> 5    Q Similar as to the Nelsons, do you have -- I
> 6    mean, can you -- can you sit -- sit here and tell us
> 7    today who you talked to to try to ascertain who that

4

```
8       was?
9       A Specifically, no.
```

*Id*. at 114:5 – 9.

Below is another example of Sgt. Wall's lack of preparedness:

```
15      Q When I say this particular shot, I mean,
16      have you -- have you asked these officers specifically
17      to identify this officer right here who's seizing
18      Ms. Laird?
19      A Some of the officers that I've spoken with,
20      yes.
21      Q Who?
22      A Detective Carlson. I believe -- I -- I
23      can't recall specifically who, but several of the
24      officers that I've spoken with. Detective Carlson for
25      sure.
1       Q So Detective Carlson is the only one you can
2       remember actually asking the question to?
3       A He's the only one that I can specifically
4       bring up by name at this time, yes.
5       Q All right. Have you inquired -- I mean,
6       this person's wearing a helmet; correct?
7       A This person appears to be wearing
8       standard-issued CDT gear, correct.
9       Q All right. So is it likely that this person
10      is either a member of a squad or an arrest team?
11      A It's likely that that member is a member of
12      a CDT team. Which CDT team, I'm not certain.
13      Q Have you communicated with the members of
14      the CDT teams to identify whether or not they know who
15      this person is?
16      A Correct. I've communicated with several
17      members and supervisors of the various CDT teams.
18      Q And shown them this photo or a similar photo
19      of this person?
20      A Again, I can't recall if I've shown every
21      single individual from every CDT team that I've
22      shown -- that I've -- that I've spoken with that I've
23      shown them this video. But many of them, yes, I have.
24      Q But the only person you can specifically
25      recall talking to is Detective Carlson?
1       A He's the only one that as I sit here right
2       now that I can bring up by name as being certain as
3       looking at this footage and inquiring into the
```

5

4       identity of that officer, correct.

*Id*. at 39:15 – 41:4.

The following exchange is typical of what occurred during the deposition

12      Q Okay. How about this person here?
13      A I don't know.
14      (The video was played.)
15      Q (By Mr. Wyrsch) Do you know who that officer
16      is right here?
17      A No.
18      Q How about this person here?
19      A No.
20      Q This officer?
21      A No.
22      Q Who is that?
23      A Retired Lieutenant William Kiphart.
24      MR. WYRSCH: Screen shot, please. 151.
25      (Exhibit 151, Screen Shot, was marked
1       for identification.)
2       Q (By Mr. Wyrsch) Do we know who's behind him?
3       A No.
4       Q Recognize anyone else in this section over
5       here?
6       A I do not.
7       Q Have you spoken with Lieutenant Kiphart,
8       retired Lieutenant Kiphart?
9       A I have not.
10      Q Recognize anybody over here?
11      A I do not.
12      Q Do you know who this person is?
13      A No.

*Id*. at 75:12 – 76:13.

Through depositions that Plaintiffs has conducted, Lt. Kiphart has been identified as centrally located in the kettle, he deployed his pepper spray multiple times, and he was in close proximity to many of the people pepper sprayed, beaten, and arrested. Sgt. Wall identified Lt. Kiphart as one of the officers who deployed pepper spray. *Id*. at 78:3 – 7, 78:14 - 16. Yet, Sgt. Wall did not interview Lt. Kiphart. Further, Sgt. Wall could not identify any officers near Lt.

Kiphart. Had he interviewed Lt. Kiphart, he may have been able to identify these essential witnesses and possible John Doe defendants.

Sgt. Wall identified various officers who used force against citizens or were in close proximity to Plaintiffs, but Sgt. Wall admitted that he did not contact those officers. This includes officers who are defendants in this case or the companion cases, like Officer Dan Coats (55:18 – 56:5), Officer Jeremiah Koerper (67:15 – 68:4), Officer Jarred Thacker (87:4 – 88:8), Officer Daniel Chamblin (124:6 – 125:6), Officer Trenton Lee (148:11 – 22), and Officer Nick Henderson (161:15 – 162:13). Sgt. Wall gave various excuses for not attempting to contact these officers, such as the officer retirement, officer transfer, and the pandemic. He provided no explanation as to why any of those scenarios prevented him from calling the officers. He even went so far as to claim that, as a law enforcement officer trained to conduct investigations, he had no idea how to contact one of the witnesses. Yet, Plaintiffs' counsel was able to easily Google the witness's new business address during the deposition. *Id*. at 135:15 – 21. Sgt. Wall admitted that he knew that as a 30(b)(6) witness he had an obligation to educate himself about the specific issues he was designated to testify about. *Id* at 149:23 – 150:1.

Sgt. Wall also admitted that he "simply disposed" of the list of officers he interviewed and "[i]t's possible that [Sgt. Wall] disposed of some of" his interview notes even though he knew litigation was pending. *Id.* at 97:21 – 99:10. Sgt Wall further admitted that he did not take notes during some his nearly 100 interviews:

```
7     Q Would you -- you said you took notes?
8     A On some occasions.
9     Q And sometimes you didn't?
10    A I think that would be accurate.
11    Q Okay. What -- what -- was -- was all of
12    this in preparation for this deposition and the
13    interrogatories or was it separate and apart? I'm
14    just trying to understand what happened.
```

```
15      A In some instances both.
16      Q Okay. And you didn't think it was important
17      to take notes?
18      MR. LAIRD: Objection. Argumentative.
19      Q (By Mr. Wyrsch) Go ahead and answer.
20      A I can't recall specifically in what
21      instances I took notes and what instances I didn't.
22      Or specifically -- I know on some occasions I took
23      notes when I felt that it was appropriate. In other
24      occasions -- in other occasions, I didn't when I
25      didn't think it was necessary.
```

*Id*. at 193:7 – 25. Quite simply, Sgt. Wall was not tasked with deciding what was important for discovery purposes. To be clear, these were not casual conversations. These were investigative interviews for the purpose of identifying officers who may have committed crimes and violated citizens' constitutional rights. Sgt. Wall is a licensed and trained law enforcement officer – an officer specifically selected for the task of, as Defendants describe it, "investigating and responding to discovery in this and companion cases." Doc. 100 at 2. At best, Sgt. Wall conducted a half-hearted "investigation." At worst, he intentionally thwarted Plaintiffs' ability to identify Plaintiffs' abusers. Either way, Sgt. Wall's actions have delayed this matter.

When asked what he had done in the two months prior to the deposition to identify the John Doe defendants, Sgt Wall responded "**(i)n the last months, I --- I haven't done nothing** (sic)." *Id.* at 50:18 – 22 (emphasis added). Once again, Sgt. Wall could not explain how his lack of activity in the months preceding the deposition comported with his obligations as a 30(b)(6) designee.

## II.      Defendants' Discovery Obligations

Defendants are correct; Plaintiffs are entitled to reasonable discovery. The parties disagree as to what is reasonable. This whole predicament is of Defendants' own making. During the event in question, the City of St. Louis permitted officers to wear face masks that hid the officers'

identities, allowed officers not to wear name tags or other forms of identification, failed to document the names and badge numbers of all officers involved in the arrests, and failed to document uses of force. As has been seen across the country, other police departments have followed the lead of the SLMPD during protests in the wake of George Floyd's death – by using their anonymity to wreak terror upon citizens. As previously alleged, an SLMPD officer under indictment laid this plan out for all to see when he texted "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a of lot of fun beating the hell out of these shitheads once the sun goes down and **nobody can tell us apart**!!!!" 97 at ¶ 109 (emphasis added).

Defendants once again try to obfuscate by claiming that "disorder and protest plagued the City of St. Louis for days during September 2017 and beyond." 100 at 6. Yet, a judge in this district has already reviewed what occurred on the night of Plaintiffs' arrest and concluded otherwise. The video evidence, as Judge Perry observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area." *See* Doc. 57 at 37, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017). In reality, by Defendants' own admission, Defendants made the decision to conduct the mass arrest nearly 90 minutes before the mass arrest began. Defendants now acknowledge that officers violated SLMPD's own "guidance" about wearing name tags or other identifying information and attempt to take refuge in their claim that "'guidance' is not law." 100 at 6. Putting *Monell* liability aside for the moment, this admission is the crux of the issue in this case. It was Defendants' own violations of "guidance" and likely intentional acts to avoid legal scrutiny of the variety in the instant case that has caused the prolonged John Doe discovery.[2]

---

[2]     To date, 33 months after the kettle, Defendants have not identified a single officer who has been disciplined in any manner for what Defendants' characterize as "guidance" violations.

Defendants do not cite a single precedential case to support their claim that John Doe discovery should end at this juncture. Defendants argue that *Munz v Parr,* 758 F.2d 1254 (8th Cir. 1985) is inapplicable because the case involved five officers, one of whom had not been identified. Yet, the *Munz* court did not restrict its finding based on the number of unidentified officers. The instant case is significantly more egregious than *Munz,* as the Complaint alleges that the John Doe defendants took intentional steps to thwart any legal culpability. Defendants seem to be arguing that the John Doe defendants should not be held to the *Munz* standard due to either their own incompetence or their own malfeasance.

Defendants further argue that the proper remedy is to dismiss without prejudice and add defendants later, if John Does are identified. This runs contrary to *Munz.* "Dismissal is proper **only** when it appears that the true identity of the defendant cannot be learned through discovery or the court's intervention." 758 F.2d at 1257 (citing *Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir. 1982)) (emphasis added). "Rather than dismissing the claim, the court should have ordered disclosure of Officer Doe's identity by other defendants named and served or permitted the plaintiff to identify the officer through discovery." *Id*. (citing *Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981)); *Bivens v. Six Unknown Agents*, 403 U.S. 388, 390 n.2, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971).

Defendants' suggested remedy, to dismiss and then amend later, would be inefficient and unnecessarily delay the matter. The proper remedy is for the Court to order each and every Defendant to take measures to identify these John Doe defendants and to revisit the matter at the close of discovery. Defendants' claim, "Plaintiffs now wish to go beyond fishing: they wish to drain the pond and collect fish from the bottom." 100 at 4. Yet, the fishing analogy better describes Defendants' conduct, as Defendants' have done everything in their power to evade the hook of their discovery obligations. Plaintiffs only have to identify the persons responsible for inciting Plaintiff's terror and

violating Plaintiffs' constitutional rights. Defendants do not get to decide which bad actors should be held accountable.

### III.    John Doe Discovery is Still Necessary

Defendants claim that "Plaintiff does not mention that, in the course of the litigation of this and companion cases, erstwhile John Doe defendants have been identified in discovery." Doc. 100 at 3. That is absurd, as Plaintiffs filed a proposed amended complaint contemporaneously with Plaintiffs' request to extend John Doe discovery. The proposed amended complaint names any John Doe defendants that have been identified to date. However, due to Defendants' intransigence, John Doe defendants remain unidentified.

Defendants argue that because Plaintiffs filed a proposed amended complaint, no further John Doe discovery is required. Plaintiffs filed the proposed amended complaint because of deadline to do so, per the Court's order. Plaintiffs named as many officers as possible at this time. However, as detailed above, Plaintiffs have not completed the process of identifying all of the John Doe defendants.

Defendants also completely misconstrue Plaintiffs' claims. In their opposition, Defendants state:

> After extensive discovery, plaintiffs now seek to name nearly every officer holding the rank of sergeant and above who was present at the intersection of Tucker and Washington. If plaintiffs can legitimately allege that every officer present personally engaged in excessive use of force against plaintiffs, see ECF 94-1, ¶¶277-286), then there is no need for any additional John Doe discovery.

Plaintiffs has asserted claims against the supervisors, based on theories of conspiracy, supervisor liability, and failure to intervene. However, Plaintiffs have also made individual liability claims against the John Doe officers because they seized and/or used excessive force against Plaintiffs. The identity of those officers is still at issue, and their liability is independent of the liability of the supervisors.

11

Finally, Defendants argue, "In the pleadings, both current and proposed, the only paragraph dedicated solely to the description of the John Doe defendants alleges the most general description of plaintiffs' version of the actions of nearly all St. Louis Police officers during the mass arrest of September 17, 2017. 100at 7. This is patently false. In the section titled "Allegations (Specific)," the proposed amended complaint details the specific actions undertaken by each John Doe defendant, as well as the specific actions undertaken be each named Defendant who made contact with Plaintiffs. There is no ambiguity. Plaintiffs' descriptions of each John Doe defendant are "sufficient to identify the person involved so process eventually can be served." *Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996).

## CONCLUSION

For the reasons stated above, Plaintiffs request that this honorable Court extend the deadline for joinder of additional parties and amendment of pleadings to July 29, 2020.

Date: June 15, 2020                    Respectfully Submitted,

                                       KHAZAELI WYRSCH, LLC

                                       By: /s/ *Javad Khazaeli*

                                       Javad M. Khazaeli, #53735(MO)
                                       James R. Wyrsch, #53197(MO)
                                       Kiara N. Drake, #67129(MO)
                                       911 Washington Avenue, Suite 211
                                       St. Louis, MO 63101
                                       (314) 288-0777
                                       javad.khazaeli@kwlawstl.com
                                       james.wyrsch@kwlawstl.com
                                       kiara.drake@kwlawstl.com

                                       and

ARCH CITY DEFENDERS

Blake A. Strode, #68422(MO)
Michael-John Voss, #61742(MO)
Maureen G. V. Hanlon, #70990(MO)
John M. Waldron, #70401(MO)
Samuel Henderson, #56330(MO)
440 N. Fourth Street, Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1012
bstrode@archcitydefenders.org
mjvoss@archcitydefenders.org
mhanlon@archcitydefenders.org
jwaldron@archcitydefenders.org
shenderson@archcitydefenders.org

**Attorneys for Plaintiffs**

13