**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ALEX NELSON ) | |
| and IRIS NELSON, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Cause No. 4:18-cv-01561-JCH |
| ) | |
| CITY OF SAINT LOUIS, MISSOURI, et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT**

In their Motion to Dismiss, Defendants distort Plaintiffs' factual allegations and impermissibly seek to incorporate information that is not included in the Third Amended Complaint ("Amended Complaint"). The Amended Complaint must be accepted as true as this juncture of the proceedings. Defendants are entitled to put forth their view of the evidence in a motion for summary judgment. Because the Amended Complaint is properly pleaded, Defendants' Motion should be denied in full.

**FACTS**

On the evening of September 17, 2017, Plaintiffs Alex and Iris Nelson, were at home about one block west of Washington Ave and Tucker Blvd. Doc. No. 117 ¶ 139. Once it looked like the area had calmed from earlier protests, they went outside. *Id.* ¶¶ 140-142. They were not participating in the protest in any way. *Id.* ¶ 143. After walking around the neighborhood and hearing police direct people to leave a specific intersection, Plaintiffs attempted to go home. *Id.* ¶¶ 144-148. When they were approximately 80 feet from home, they observed a line of police. *Id.* ¶ 149. Plaintiffs, at the direction of officers, eventually walked to the northeast corner of Washington Avenue and Tucker Boulevard, where they observed a large group of peaceful and compliant

people. *Id.* ¶¶ 145, 151. Suddenly and without warning, police in riot gear surrounded Plaintiffs and everyone else within a block of the intersection. *Id.* ¶ 152.

Instinctively, Plaintiffs went to the ground, put their hands behind their backs, and took a compliant pose. *Id.* ¶¶ 153-55. Although Plaintiffs had broken no laws, Defendants Bill Kiphart and Matthew Burle pepper sprayed them indiscriminately. *Id.* ¶ 156. Mrs. Nelson was pepper sprayed and suffered pain and burning to her face, hands, and arms and temporarily lost sight in her right eye. *Id.* ¶ 157. Defendant Stephen Walsh tightly and painfully zip tied Mrs. Nelson's hands. *Id.* ¶ 158. Defendant James Harris III violently twisted her arms, despite her compliance. *Id.* ¶ 159. After Mr. Nelson had already been pepper sprayed twice, an unidentified officer lifted Mr. Nelson's head and pepper sprayed him directly in his eyes from point blank range. *Id.* ¶ 162. Later, Defendants Samuel Rachas, Keith Burton, Joe Lankford, and Walsh, and an unidentified officer dragged Mr. Nelson across the pavement with enough force to destroy Mr. Nelson's footwear, injuring his face, arm, and shoulder. *Id.* ¶ 163. Defendants Rachas, Burton, Lankford, Walsh, Mickey Christ, Joshua Witcik, and the other officer then knelt on Mr. Nelson's body and zip tied him, painfully and tightly. *Id.* ¶ 164. Defendant Lankford then denigrated Mr. Nelson with a homophobic slur. *Id.* ¶ 165.

A handful of individuals broke windows and flowerpots on the 900, 1000, and 1100 blocks of Olive Street, but no officers reported any violence or property destruction after 8:30 pm. *Id.* ¶¶ 42, 58, 128. Nevertheless, Defendant Gerald Leyshock, the incident commander, Defendant Daniel Howard, and Defendant Timothy Sachs, commander of the tactical units, developed the plan to amass police officers in such a manner that citizens would be unable to exit and to arrest everyone present, three hours after the property destruction, at 11:30 pm. *Id.* ¶¶ 12, 13, 14, 46, 55.

Defendants Brian Rossomanno and Randy Jemerson were in charge of the Civil Disobedience Team that effectuated arrest and were responsible for carrying out the mass arrest. *Id.* ¶¶ 15, 16, 111. Defendant Rossomanno issued a dispersal order 45 minutes before the mass

arrest at the intersection of Tucker and Locust Street, directing people to walk north on Tucker or west on Locust. *Id.* ¶ 131. The vague, inaudible dispersal order was merely a pretense for the illegal arrests of peaceful citizens, as the St. Louis Metropolitan Police Department (hereinafter "SLMPD") had already decided to arrest everyone in the vicinity of Tucker and Washington at about 10:00 pm. *Id.* ¶¶ 130-131. Worse, Defendants Rossomanno, Jemerson, and Matthew Karnowski directed civilians to Washington and Tucker for that purpose. *Id.* ¶¶ 50, 53, 129, 130, 145. The mass arrest occurred at 11:30 pm – 40 minutes after the last dispersal order – and two blocks away from the dispersal order, and despite the fact that the civilians present at Washington and Tucker at that time were calm and not engaged in any violent activity. *Id.* ¶¶ 93, 132, 151. Defendants terrorized Plaintiffs and the other civilians due to perceived criticism of the SLMPD. *Id.* ¶¶ 71, 80, 82, 98, 99, 104-108, 202.

Defendants Scott Boyher, Jemerson, Karnowski, and Rossomanno were all physically present at the illegal kettling location and directed the officers under their command. *Id.* ¶¶ 11, 13-15, 53, 56, 59, 68, 83, 94, 103, 120, 127. Defendants Boyher and Karnowski directed the officers under their command to arrest and use force against the peacefully assembled individuals. *Id.* ¶ 83. Defendants Boyher, Jemerson, Karnowski, and Rossomanno observed SLMPD officers as they pepper sprayed and beat compliant citizens but did nothing to intervene. *Id.* ¶¶ 11, 13-15, 53, 56, 59, 68, 83, 94, 103, 127. Further, Defendants Jeremy Davis, Harris, Kiphart, Burle, Rachas, Burton, Lankford, Walsh, Christ, and Witcik prevented Plaintiffs from leaving the area, used excessive force on them, and/or unlawfully arrested them. *Id.* ¶¶ 18-21. The Defendants identified in paragraph 17 of the Amended Complaint, Supervisor Officers, prevented Plaintiffs from leaving the area, directed their subordinates to arrest Plaintiffs without probable cause, and failed to intervene when their subordinates used force on Plaintiffs. *Id.* ¶¶ 17, 63, 83-87, 101. Upon their release from jail on September 18, 2017, Plaintiffs received a criminal summons and a court date for initial appearance. *Id.* ¶ 117.

**ARGUMENT**

I.      **The Court Should Only Consider the Allegations within the current Amended Complaint.**

Defendants do not limit their arguments to the facts as pleaded by Plaintiffs and explicitly ask the Court to examine evidence outside of the pleadings and make inferences against Plaintiffs instead. Defendants boldly and falsely state, "Plaintiffs admit that there had been violence earlier that night in connection with the group that was to be encircled, and acknowledge that orders to disperse had been given repeatedly." Doc. No. 122 at 2. In actuality, the Amended Complaint states that unknown people committed property damage, not violence, several blocks away, three hours before Plaintiffs' arrest. Doc. No. 38 at ¶¶ 46, 61. In the kettle, instead of targeting these unknown people, Defendants arrested law-abiding civilians, including residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, a homeless person, and an even an undercover SLMPD officer. Doc. No. 38 at ¶¶ 70, 77. The Amended Complaint further states that Defendants gave inaudible dispersal orders several hours before the kettling and then gave a final dispersal order 45 minutes prior to the kettling, several blocks away from Washington and Tucker, and directed people to Washington and Tucker to trap those persons in the kettle. *Id.* ¶¶ 48-49, 51, 131. Finally, Defendants argue, "Plaintiffs acknowledge that many persons in the group of arrestees were sporting masks and goggles . . . and it is indisputable that a crowd was milling about in the intersection of Tucker and Washington, at least partially blocking the intersection." Doc. No. 122 at 2. Again, Defendants misrepresent Plaintiffs' allegations. Plaintiffs allege that some among the more than 100 people arrested in the kettling were wearing goggles, some were wearing paper masks, and four or five people were sitting in the street after police had already closed it to traffic. Doc. No. 117 ¶¶ 96, 97, 132.

To support these distortions of the facts, Defendants rely on exhibits Plaintiffs attached to a previous version of the Complaint (Doc. No. 38-7) in an attempt to contradict what can be seen

on multiple videos. Defendants also cite their own self-serving testimony from previous Exhibit E (Doc. No. 38-5), a transcript from a hearing involving the kettling at issue while wholly ignore the other testimony from multiple other witnesses included in the transcript which directly and credibly refutes the Defendants' testimony. Defendants cite *Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016) in support. Yet, *Hoefling* states, "As a matter of law, the second amended complaint filed by Mr. Hoefling 'supersede[d] the former pleading[s]; the original pleading[s] [were] abandoned by the amendment, and [were] no longer a part of [Mr. Hoefling's] averments against his adversar[ies].' So when Mr. Hoefling filed the second amended complaint, the first amended complaint (and its attached exhibits) became a legal nullity." 811 F.3d at 1277 (quoting *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006). In *Hoefling*, the Eleventh Circuit held that, because the plaintiff abandoned notices and reports drafted by the defendants to document their perspectives in his subsequent complaint, and his allegations directly conflicted with the defendants' statements therein, the district court erred by considering the statements and accepting them as true. 811 F.3d at 1278. Defendants ask the Court to take judicial notice pursuant to Fed. R. Evid. 201. This request is misplaced as a court can only "judicially notice a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). In the present case, Plaintiffs' allegations and Defendants' self-serving statements conflict, and the circumstances giving rise to Plaintiffs' arrests are certainly in dispute. *See Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018) (finding that the district court could judicially notice a document outside the pleadings because the facts therein were consistent with the complaint.)

Assuming *arguendo* that the Court can consider these exhibits from a previous complaint, the mere inclusion of these exhibits in the prior pleadings does not make all statements made during those hearings uncontested facts. "Where a plaintiff attaches to the complaint a document containing unilateral statements made by a defendant, where a conflict exists between those statements and the plaintiff's allegations in the complaint, and where the attached document does

not itself form the basis for the allegations, Rule 10(c) 'does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact.'" *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008). The cited testimony is vehemently opposed by Plaintiffs because it wholly ignores the other testimony and evidence from multiple other witnesses included in the transcript which directly and credibly refutes the Defendants' testimony.

Defendants' Motion asks this court to look outside of the Amended Complaint and, worse, resolve disputed issues of fact at the pleadings stage. This is inappropriate given the standard on a Motion to Dismiss, and Defendants' Motion should be denied in full.

## II.   Defendants Are Not Entitled to Qualified Immunity Because Plaintiffs' Rights Are Clearly Established.

Defendants are not entitled to qualified immunity because Plaintiffs had clearly established rights to be free from unreasonable seizure and excessive force in September 2017. Defendants disingenuously rely on a summary judgment ruling in a different case and cherry-picked, self-serving statements made by Defendants, outside the Amended Complaint. These statements cited by Defendants are not admitted by Plaintiffs and are contradicted by the allegations in the Amended Complaint.

### A.  Plaintiffs Had Clearly Established Rights to be Free from Unreasonable Seizure.

To gain the protection of qualified immunity, an officer must have at least arguable probable cause for the seizure. *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (citing *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)). Probable cause exists "'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Id.* Arguable probable cause exists when "'an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Id.*

Defendants' cited support for the reasonableness of the arrest is unpersuasive.[1] Defendants primarily rely on *Bernini,* in which the Eighth Circuit analyzed the difficult question of probable cause analysis in the context of a mass arrest and held the Fourth Amendment requires that "the officers have grounds to believe all arrested persons were a part of the *unit* observed violating the law.'" 665 F.3d at 1003 (emphasis in original). In *Bernini*, officers were positioned to block protestors from marching into downtown St. Paul, Minnesota. *Id.* at 1001. At one of the intersections, 100 protestors stood across the sidewalk from that intersection's eleven officers who had just received reports that the group was involved in unlawful activity. *Id.* Fifteen protestors moved towards the officers and ignored the officers' orders to move back, only retreating after the officers fired rubber pellets. *Id.* After the fifteen protestors rejoined the larger group, members of the larger group propelled rocks and feces at the officers. *Id.* Additional protestors joined the march as the officers pushed the protest away from downtown, and, by the time the officers had an opportunity to "gather the crowd," the group of protestors was nearly 400-strong. *Id.* at 1001. After providing clear instruction over a loudspeaker that all in the area were under arrest, the officers directed the group to sit down and put their hands on their heads. *Id.* The officers immediately released 200 individuals whom they determined were not part of the earlier confrontation; the officers took the remaining 200 persons into custody. *Id.* Although the officers later determined that some of the 200 people arrested were not present at the earlier confrontation, the court held that the officers had arguable probable cause as to those people due to a reasonable, yet mistaken,

---

[1]     Defendants cite *Burbridge v. City of St. Louis, Missouri*, arguing that the *Burbridge* court found the officers qualifiedly immune to the Burbridges' unreasonable seizure claim on a motion for summary judgment. Doc. No. 122 at 7. The *Burbridge* court found "uncontroverted evidence" that the officers had probable cause or arguable probable cause to arrest the Burbridges, 430 F. Supp. 3d 595, 610 (E.D. Mo. 2019), based on a very different factual record that which Plaintiffs have and will put forward in this case. The *Burbridge* record included key factual admissions by the Burbridges that Plaintiffs will vigorously contest. Plaintiffs' record will include substantial evidence to controvert the admissions upon which the *Burbridge* court relied. Further, Defendants' arguments are more suited for the summary judgment stage.

belief that they had whittled out all of the innocent bystanders. *Id.* at 1005. The court further concluded that a reasonable officer would believe the 200 arrestees were acting as a unit because, after the violent confrontation at the intersection, the group remained intact, the group chanted in unison, and the group continued to move together as the police moved them away from downtown. *Id.* at 1003-04.

In the present case, Defendants identify no facts evidencing that Defendants observed those arrested in the September 17, 2017 kettling acting as a unit other than the fact that all the people obeyed the police orders to go to the corner of Washington and Tucker. Taking the evidence in the light most favorable to Plaintiffs, the citizens arrested in the kettle did not act as a unit to violate the law. Defendants made inaudible dispersal orders several blocks away and no less than 45 minutes before the kettling, making it unreasonable to assume those arrested in the kettle were cognizant of any potentially unlawful acts or even present for the orders. *See White v. Jackson*, 865 F.3d 1064, 1075–76, 1079-80 (8th Cir. 2017). Unlike the arrestees in *Berini*, those arrested in the September 17, 2017 kettling were not a unit throwing rocks or feces at police or engaging in any violence or disobedience. The instant arrestees were not chanting in unison. The instant arrestees were not part of an organized crowd. Many of the instant arrestees were simply residents or patrons of businesses on Washington Avenue who were completely uninvolved in the evenings' earlier events. Unlike the officers in *Berini*, Defendants arrested *everyone* near Washington and Tucker and made no attempt to whittle down the group of arrestees to the people they believed had engaged in unlawful conduct. *See Carr v. Dist. of Columbia*, 587 F.3d 401, 407 (D.C. Cir. 2009) (holding particularized probable cause requires officers to "have grounds to believe all arrested persons were a part of the unit observed violating the law."). *See also Barham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006) (finding no evidence arrestees were acting as a unit when there was a significant time lag between the criminal acts and the arrests, civilians flowed freely in and out of the area, and the officers made no attempt to distinguish between the illegal actors and law-abiding

individuals). In *Baude v. City of St. Louis*, Judge Rodney Sippel properly held that *Bernini* was distinguishable, finding:

> Plaintiff's allegations of what occurred at the Washington and Tucker intersection on September 17, 2017, do not establish that the officers in this case could reasonably have concluded the group at the intersection was acting as a unit or violating the law. The evidence shows no credible threat of force or violence to officers or property. There were no reports of property damage or violence after 8:30 p.m., and the scene at the intersection was relatively calm, although some people continued to engage in protest activity by voicing their displeasure with police.

476 F. Supp. 3d 900, 910 (E.D. Mo. 2020).

Without particularized probable cause to support Plaintiffs' arrests or a reasonable belief that citizens arrested in the kettling were acting as a unit observed violating the law, Defendants did not have probable cause to arrest Plaintiffs. Thereby, Defendants seized Plaintiffs without probable cause in violation of Plaintiffs' clearly established Fourth Amendment rights.

Defendants argue that, even if Defendants Leyshock and Sachs mistakenly believed they had probable cause, the mistake was reasonable because they believed that it was "important to control a chaotic and *potentially* combative scene."[2] Doc. No. 122 at 7. (Emphasis added). But in her decision granting a temporary injunction in another case concerning the September 17, 2017 kettling, *Ahmad v. City of St. Louis*, Judge Catherine Perry reviewed and analyzed video taken by Jonathan Ziegler, one of the other kettling arrestees, in the forty-five minutes up to and including the mass arrest and determined that she did not observe a "large crowd congregating in the streets" or any "violent activity by protesters," and the "scene appear[ed] calm." Doc. No. 117 ¶ 132. People were simply milling about in small groups at various areas in and around the intersection. The property damage occurred many hours before the mass arrest and at a different location, Doc.

---

[2]     Defendants cite *Kelsey v. Ernst*, 933 F.3d 975 (8th Cir. 2019) (en banc) and *Rudley v. Little Rock P.D.*, 935 F.3d 651 (8th Cir. 2019), without pin cites, for the purported purpose of establishing Defendants Leyshock and Sachs's reasonable beliefs that they had probable cause to arrest everyone at Washington and Tucker. Doc. No. 122 at 8. However, those cases concern the reasonableness of force, not seizure. *Kelsey*, 933 F.3d 977; *Rudley*, 935 F.3d at 652.

No. 117 at ¶¶ 42, 58 128, and Defendants cite no reason for the officers to believe those arrested were involved or the property damage would resume. *See Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977)) ("[I]f it is substantially infected with violence or obstruction the police may act to control [a demonstration] as a unit.") Defendants cite to no authority that excuses police actions because a supervisor believes, without any basis, that there is potential for unrest and orders the use of excessive force.

Defendants also argue that, even if Plaintiffs' arrests were not supported by probable cause or arguable probable cause, Defendants Boyher, Jemerson, Karnowski, Rossomanno, and the remaining Defendant Officers reasonably relied on their orders from Defendants Leyshock and Sachs. Doc. No. 122 at 8. In support of their position, Defendants cite "*Bell v. Neukirch*, 2020 U.S.App.LEXIS 33920 (8th Cir. 2020)." As they do not explain the basis for their citation or even offer a pin cite, Plaintiffs are left to guess why this case was cited.[3] In *Bell*, the Eighth Circuit reversed a district court's grant of summary judgment in favor of police officers who arrested plaintiff without probable cause. *Bell v. Neukirch*, 979 F.3d 594, 599 (8th Cir. 2020). The case involved two police officers, Munyan and Neukirch, who attempted to stop a suspect who reportedly had a gun. *Id.* at 600. The suspect fled, and the officers broadcast a description of the suspect. *Id.* Bell was detained by another officer, and officers Munyan and Neukirch identified Bell as the fleeing suspect. *Id.* at 601. Video evidence ultimately proved that Bell was not the

---

[3]     Defendants also cite *Garcia v. Doe*, 779 F.3d 84 (2d Cir. 2014). Doc. No. 122 at 8. Again, because Defendants offer no pin cite, it is unclear why Defendants are referring to this Second Circuit opinion. *Garcia* does not absolve officers of liability due to reliance on orders from their superiors. The Second Circuit analyzed whether a defense to a crime was so clearly established as to require an officer to consider that defense in his evaluation of probable cause for arrest. 779 F.3d at 93. In the instant case, the Amended Complaint alleges that Defendant Officers did not have actual or arguable probable cause supporting the *elements* of any criminal offense for which to arrest Plaintiffs. Plaintiffs do not allege that Defendant Officers should have considered legal defenses Plaintiffs would be permitted to argue in a criminal proceeding prior to arresting Plaintiffs.

suspect and that Munyan and Neukirch should have known that at the scene. *Id.* The district court granted summary judgment in favor of Munyan and Neukirch, and this court reversed. *Id.* at 610.

The only aspect of the case that appears to relate to Defendants' theory is that the Court affirmed the grant of summary judgment in favor of two supervisors who authorized Bell's detention, relying on specific, detailed information provided by Munyan and Neukirch. The Court found, "It was objectively reasonable for Sergeant Ortiz and Detective Mattivi to rely on an assurance of probable cause from two officers who witnessed the crime and who represented that they had confirmed Bell's identity as the suspect through video evidence." *Id.* at 609.

In this case, however, Defendants are asking the Court to hold the polar opposite. Unlike the two supervisors in *Bell,* Defendants were present at the time of the mass arrests and had personal knowledge of what was happening on the scene. They could not simply assume SLMPD followed proper procedure. *See Quraishi v. St. Charles County, Missouri*, 19-2462, 2021 WL 278347, at *4 (8th Cir. Jan. 28, 2021) ("Anderson is not entitled to qualified immunity even if his sergeant told him to deploy the tear-gas . . . nothing in *Heartland* [*Acad. Cmty. Church v. Waddle*, 595 F.3d 798 (8th Cir. 2010)] says that a government official is immune if a superior instructs him to engage in unconstitutional conduct.")

The Amended Complaint alleges that Defendants Rossomanno and Jemerson directed people to the corner because Defendants had already decided that they would kettle, spray, and illegally arrest Plaintiffs. Doc. No. 117 at ¶ 130-31. The Complaint also alleges that Defendants Boyher, Rossomanno, Jemerson, Karnowski and the remaining Defendant Officers were part of a phalanx of officers who surrounded citizens in the intersection, prohibited the citizens from leaving, and then arrested those same citizens for being in the intersection. *Id.* at ¶¶ 63-77. Even if these Defendants did rely in part on information from their supervisors, this reliance must be reasonable. Because Defendants were physically present at the scene and could see for themselves that Plaintiffs were not engaged in any criminal activity, no such reliance can be deemed

reasonable. "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Bell*, 979 F.3d at 603 (citing *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)). Defendants' Motion should be denied.

### B.  Plaintiffs Had Clearly Established Rights to be Free from Excessive Force.

"Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a *lawful* seizure." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (emphasis added).[4] Courts "look to the specific circumstances, such as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) (quoting *Graham,* 490 U.S. at 396)). "'[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.'" *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)). "The dispositive question is whether the officer's conduct was objectively reasonable under the circumstances, as judged from the perspective of a reasonable officer on the scene at the time the force was applied." *Pennycook*, 641 F.3d at 907.

Defendants claim that Plaintiffs' injuries are *de minimis* is not supported by Plaintiffs' allegations or the law. Since at least 2006, it has been the law in the Eighth Circuit that an officer

---

[4]     Defendants cite *Jackson*, which provides that placing a knee on an arrestee's back to facilitate a *lawful* arrest is not excessive force per se. 865 F.3d at 1080. Defendants also cite *Crumley v. City of St. Paul*, which provides that tightly applying handcuffs in the course of a *lawful* arrest, without evidence of long-term injury, is not excessive force. 324 F.3d 1003, 1007-08 (8th Cir. 2003). However, the Amended Complaint alleges that Defendant Officers arrested Plaintiffs *unlawfully*.

violates the Fourth Amendment when he subdues and handcuffs someone who did not commit a crime and that the officer knows was not resisting or threatening officers. *Perry*, 858 F.3d at 1146 (8th Cir. 2017) (citing *Smith v. Kansas City Police Dep't*, 586 F.3d 576, 582 (8th Cir. 2009)). Plaintiffs had not committed any crimes and were complying with orders when Plaintiffs were blasted with the pepper spray, Mrs. Nelson arms were twisted, and Mr. Nelson was dragged across the pavement. Doc. No. 117 ¶¶ 156-166.

In *Pennycook*, decided in 2011, the Eighth Circuit held that *de minimis* injury *is* sufficient to establish the use of excessive force. 641 F.3d at 908-909.[5] *See Perry*, 858 F.3d at 1146. Plaintiffs had clearly established rights at the time of Defendants' unconstitutional conduct. *See Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999) (where the Eighth Circuit found that a small cut above the plaintiff's eyelid and small scrapes on the plaintiff's knee and calf constituted excessive force). *See also Dawkins v. Graham*, 50 F.3d 532, 535 (8th Cir. 1995) (where the Eighth Circuit found that bruising and facial lacerations constituted excessive force).

The Eighth Circuit has found short bursts of pepper spray unreasonable. In *Tatum v. Robinson*, the plaintiff attempted to steal from a retailer in April 2014. 858 F.3d 544, 546 (8th Cir. 2017). An officer approached the plaintiff and told him he was under arrest and ordered him to put his hands on a clothing rack. *Id.* The plaintiff did not comply and began to yell instead. *Id.* The officer warned the plaintiff that he would pepper spray the plaintiff if the plaintiff did not calm down; fourteen seconds later, the officer sprayed the plaintiff for "one second." *Id.* The Eighth Circuit determined that, under *Graham*, the pepper spraying constituted excessive force, given that the plaintiff was not suspected of a severe crime, the plaintiff was not an immediate threat to anyone's safety, and the plaintiff was not actively resisting arrest. *Id.* at 548-49. Even if the officer

---

[5]     Defendants cite *Peterson,* a case involving a lawful arrest, in which the Eight Circuit held that, at the time of the arrest, the officer did not violate a clearly established right by pepper spraying the plaintiff. 754 F.3d at 600-01. The Eight Circuit held that the right not to be subjected to *de minimis* injury was not clearly established until *Pennybrook* was decided in 2011. *Id.* at 601.

could have used "*some* force" given the plaintiff's noncompliance, the court found that it was unreasonable for the officer to use pepper spray immediately, as it is "significant force" that causes "more than temporary pain." *Id.* The Eighth Circuit held that force was "least justified" against the plaintiff because the plaintiff was "a non-resisting, non-fleeing individual suspected of a completed, non-violent misdemeanor." *Id.* at 549.[67] *See Quraishi*, 2021 WL 278347, at *6 (citing *Peterson*, 754 F.3d at 600-01)) ("[U]se of pepper spray to arrest an unarmed, compliant suspect can be excessive force.")

In an attempt to justify Defendant Officers kneeling on and dragging Mr. Nelson and twisting Mrs. Nelson's arm, Defendants cite *Shelton v. Stevens*, which provides that officers can use "supplemental force" on a non-compliant, potentially violent suspect even when the suspect is being restrained by other officers. 964 F.3d 747, 752-54 (8th Cir. 2020). However, as is the case with Plaintiffs, "supplemental force" is not permissible on compliant persons, particularly those who are already restrained. *Id.* at 754 (citing *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009), *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006), *Karels v. Storz*, 906 F.3d 740, 745-47 (8th Cir. 2018), and *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012)). Defendants also cite *Blazek v. City of Iowa City*, which involved the state of excessive force law prior to 2011 and force on a suspect who resisted a lawful detention. 761 F.3d 920, 923-24 (8th Cir. 2014). In the present case, the Amended Complaint alleges that Plaintiffs were not lawfully seized, nor were Plaintiffs resisting. Moreover, *Blazek* provides, "It was clearly established in 2009 that when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment." *Id.* at 925 (citing 439 F.3d at 503).

---

[6]     Ultimately, the *Tatum* court granted the officer qualified immunity after concluding that the plaintiff's right was not clearly established at the time. *Id.* at 551. Post *Tatum*, a reasonable officer would know that pepper spraying compliant, non-fleeing individuals suspected of low-level misdemeanors is unreasonable.

In the present case, taking the facts in the light most favorable to Plaintiffs, Defendants subjected Plaintiffs to "significant force" even though Plaintiffs were persons against whom force was "least justified." Because Plaintiffs' arrests were not supported by probable cause, Defendants were not authorized to use *any* force against Plaintiffs, including the application of hand restraints. By pepper spraying Plaintiffs without warning, despite their compliance, and despite having no suspicion that Plaintiffs were committing violent crimes, Defendants violated Plaintiffs' clearly established rights. By twisting Mrs. Nelson's arms, dragging Mr. Nelson across the pavement, and applying zip ties tight enough to cause lasting pain, Defendants violated Plaintiffs' clearly established rights. Every *Graham* factor weighed against the force Defendants exacted on Plaintiffs: Plaintiffs did not commit any crime, much less a severe or violent crime; Plaintiffs were not a threat to anyone's safety; Plaintiffs were fully complying with officer's orders; and Plaintiffs were not actively resisting or attempting to flee. Therefore, Defendants' Motion should be denied.

**C.  Defendants Leyshock, Sachs, Boyher, Jemerson, Karnowski, Rossomanno, and Other Supervisor Officers Do Not Have Qualified Immunity Against Plaintiffs' Federal Claims Because They Ratified or Ignored Their Subordinates' Violations of Plaintiffs' Clearly Established Rights.**

It is well established in the Eighth Circuit that supervisors are liable where they personally participate in a constitutional violation, or when they knew about unconstitutional conduct and facilitated, approved, condoned or turned a blind eye to such conduct. *Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011) (citing *Ottman v. City of Independence*, Mo., 341 F.3d 751, 761 (8th Cir. 2003) (citations and internal quotes omitted). *See Andrews v. Fowler,* 98 F.3d 1069, 1078 (8th Cir. 1996) (finding that tacit authorization or failure to sufficiently supervise the offending actions of an employee sufficient for supervisor to be liable). Further, a supervisor can be found liable under § 1983 "for deliberate indifference if he is aware of 'a substantial risk of serious harm,' even if he is not aware that the harm has, in fact, occurred." *Kahle v. Leonard,* 477 F.3d 544, 551–52 (8th Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, (1994)).

Defendants Leyshock, Sachs, Boyher, Jemerson, Karnowski, Rossomanno, and the other Supervisor Officers directed their subordinates to make arrests, observed their subordinates pepper spraying and otherwise assaulting compliant citizens, and did nothing to intervene. *Id.* ¶¶ 12-17, 18, 20, 50, 53, 56, 61-63, 70, 82-90, 101, 137. The above referenced Defendants personally participated in Plaintiffs' seizures, preventing Plaintiffs from leaving the area, and Supervisor Officers including Defendants Kiphart and Lankford personally used excessive force on Plaintiffs. *Id.* ¶¶ 61-63, 70, 87, 156, 163-166. Plaintiffs sufficiently pleaded facts that, accepted as true, state claims against Defendants Leyshock, Sachs, Boyher, Jemerson, Karnowski, Rossomanno, and Supervisor Officers for their personal violations of Plaintiffs' rights through their direct actions against Plaintiffs and their facilitation, approval, condonation, or blind eyes to their subordinates' misconduct. At the least, these facts create reasonable inferences in favor of Plaintiffs, such that Plaintiffs' federal claims against Defendants Leyshock, Sachs, Boyher, Jemerson, Karnowski, Rossomanno, and Supervisor Officers should not be dismissed at the pleadings stage.

### III. Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Conspiracy Claims, and the Intracorporate Conspiracy Doctrine Is Inapplicable.

Defendants are not entitled to qualified immunity on Plaintiffs' § 1983 conspiracy claims, because they violated Plaintiffs' constitutional rights to be free from unreasonable seizure and excessive force, and those rights were clearly established in September 2017. The Eighth Circuit has specifically deemed qualified immunity to be inappropriate when the plaintiff alleges facts that defendant police officers conspired to wrongfully arrest him without probable cause and in retaliation for protected speech. *Small*, 708 F.3d at 1010.

Defendants banded together to violate Plaintiffs' clearly established Fourth Amendment rights. Although Defendants were on notice that their actions were unconstitutional, they now argue that there is an exception to this rule when they work together and predetermine to violate a citizen's rights. Defendants argue that because the Eighth Circuit has not ruled on the intracorporate conspiracy doctrine's applicability to § 1983 conspiracy claims Defendants could

not have known that working together to commit acts that they were on notice were unconstitutional absolves them of liability. Defendants are making a patently absurd argument that, while it may be unconstitutional to violate Plaintiffs' rights, they are entitled to qualified immunity because the Eighth Circuit has not expressly held that parties cannot *conspire* to violate Plaintiffs' rights. Qualified immunity does not shield unconstitutional behavior simply because officers decide to violate citizens' rights as a group instead of violating citizens' rights individually.

In *Ziglar v. Abbasi*, the U.S. Supreme Court notes that the intracorporate conspiracy doctrine is applicable to § 1985 conspiracy claims because "[w]hen two agents of the same legal entity make an agreement in the course of their official duties . . . as a practical and legal matter their acts are attributed to their principal." 137 S. Ct. 1843, 1867 (2017). Conversely, in § 1983 cases, "local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employee' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal citations omitted).

Further, in *Ziglar*, the Court found that communications amongst the defendants warranted the application of the intracorporate conspiracy doctrine because "the discussions were the preface to, and the outline of, a general and far-reaching policy." 137 S. Ct. at 1867. In the present case, Defendants' coordination of Plaintiffs' arrests and the force against Plaintiffs was not a result of general or far-reaching policy. These constitutional violations resulted from specific plans to arrest people present at the intersection of Tucker and Washington on the night of September 17, 2017.

In fact, the Eighth Circuit has held that, while a government entity generally cannot conspire with itself under § 1985, there is an exception if its agents acted "beyond the scope of their authority" at the time of the conspiracy. *Barstad v. Murray County*, 420 F.3d 880, 887 (8th Cir. 2005) (citing *Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir. 1987)). Several courts have held that allegations of police misconduct or excessive force are not protected because the purpose

17

of the intracorporate conspiracy doctrine is to shield corporations from liability for "routine, collaborative business decisions," finding that "conspiracies and cover-ups are not the product of routine police department decisions-making." *Pinell v. City of Gerald, Mo.,* 2018 U.S. Dist. LEXIS 45957, at \*24 (E.D. Mo. Mar. 21, 2018); *Golden v. Moutray,* 2018 U.S. Dist. LEXIS 62828, at \*11 (E.D. Mo. Apr. 13, 2018). Defendants' Motion should be denied.[8]

## IV.   Plaintiffs' State Law Claims Are Not Barred by Official or Sovereign Immunity.

### A.   Plaintiffs' state law claims are not barred by official immunity.

Official immunity "'does not apply to discretionary acts done in bad faith or with malice.'" *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (quoting *Blue v. Harrah's North Kan. City, LLC*, 170 S.W.3d 466, 479 (Mo. App. 2005)). "'A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.'" *Davis*, 794 F.3d at 1013 (quoting *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. banc 1986)). "Bad faith" means "'conscious wrongdoing'" or "'breach of a known duty through some ulterior motive.'" *Id.*

Defendant Officers acted in bad faith or with malice. A reasonable officer would recognize that arresting and consciously or intentionally injuring law-abiding citizens for the exercise or perceived exercise of their First Amendment rights is a violation of her duties as an officer. Defendant Officers unconstitutionally seized Plaintiffs to deter criticism of the SLMPD. Doc. No. 117 ¶ 107. Defendant Officers indiscriminately pepper sprayed, dragged, and assaulted Plaintiffs themselves, or failed to prevent their subordinates from doing so, even though Plaintiffs were not resisting. Defendants terrorized Plaintiffs and the other civilians due to perceived criticism of the

---

[8]   Plaintiffs acknowledge that Judge Sippel granted officers qualified immunity on the basis of intracorporate conspiracy in a related case. *See Baude*, 476 F. Supp. 3d at 916. Plaintiffs maintain that the doctrine does not bar § 1983 conspiracy claims concerning police misconduct, and Plaintiffs further note that the issue is under submission before the Eighth Circuit, in *Burbridge v. Biggins*, No. 20-1029.

SLMPD. *Id.* ¶¶ 71, 80, 82, 98, 99, 104-108, 202. Defendant Officers' egregious misconduct establishes that they are not entitled to official immunity for Plaintiffs' state law claims.

Additionally, the malicious prosecution cases cited by Defendants are inapposite. In *Koury v. Straight*, a malicious prosecution case stemming from a civil action, the court found that no action had proceeded against the plaintiff because there was no summons issued in the matter giving rise to the plaintiff's claim. 948 S.W.2d 639, 642 (Mo. App. 1997). In the present case, upon their release from the jail on September 18, 2017, Plaintiffs received a criminal summons and a court date for initial appearance. Doc. No. 117 ¶ 117. Defendants provide no authority to dispute that these summonses initiated process against Plaintiffs. In *Baker v. St. Joe Minerals Corp.*, decided on summary judgment, the court dismissed the plaintiff's claim because he was suing his employer for malicious prosecution when the evidence established that it was law enforcement who had initiated the charges against him. 744 S.W.2d 887, 889 (Mo. App. 1988). Similarly, in *Hunter v. Karchmer*, decided on a motion for judgment notwithstanding the verdict, the court reversed a judgment for the plaintiff on its finding that the prosecutor, not the defendant mayor, initiated charges against the plaintiff, upon the prosecutor's own investigation. 285 S.W.2d 918, 930-31 (Mo. App. 1955). In the present case, the Amended Complaint plainly alleges that Defendants initiated charges against Plaintiffs. Defendants argue that "there is no allegation of any improper or 'perverted' use of process." Doc. No. 122 at 13. However, "the test employed is whether the process has been used to accomplish some unlawful end . . . 'it is where the suit is brought for a collateral purpose that there is abuse of process.'" *Duvall v. Lawrence*, 86 S.W.3d 74, 85 (Mo. App. 2002) (quoting *R. Rowland & Co., Inc. v. Smith*, 698 S.W.2d 48, 52 (Mo. App. 1985)). Defendant Officers ignore that *Duvall* abused process because they unlawfully arrested Plaintiffs, initiating criminal charges against Plaintiffs for terroristic purposes.[9]

---

[9]     Defendants cite *Burbridge*, seemingly to purport that Defendant Officers could not have falsely imprisoned or maliciously prosecuted Plaintiffs because Defendant Officers arrested

Defendants argue that Mrs. Nelson's claims for negligent infliction of emotional distress and intentional infliction of emotional distress are not actionable because Mrs. Nelson has other claims pleaded, like assault and battery.[10] Doc. No. 122 at 13. Defendants' argument is incorrect. Intentional infliction of emotional distress is "intended to supplement existing forms of recovery" in cases where the sole motivation for the act was to cause emotional distress. *Sansonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. 1998) (overruled on other grounds). Mrs. Nelson's infliction of emotional distress claims have a "factual and legal basis independent from that of her assault and battery claims." *State ex rel. Halsey v. Phillips*, 576 S.W.3d 177, 181 (Mo. banc 2019). Mrs. Nelson's intentional infliction of emotional distress claim is discrete if "a jury could reasonably find the facts [Mrs. Nelson] alleges are 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. banc 1997)). Because negligent infliction of emotional distress does not include a "sole motivation" requirement, there is no bar to that tort being raised along with claims alleging assault or any other tort. *See Brown v. City of Pine Lawn*, No. 4:17CV01542 ERW, 2018 WL 950211, at *7 (E.D. Mo. Feb. 20, 2018). Further, even assuming *arguendo* that some of Mrs. Nelson's tort claims are incompatible, that does not prevent Mrs. Nelson from raising infliction of emotional distress claims at the pleading stage. Federal Rule of Civil Procedure 8(d)(3) specifically allows a plaintiff to plead inconsistent claims. At the least, the infliction of emotional distress claims are alternative theories of recovery and are otherwise properly pleaded.

---

Plaintiffs and the other kettled persons upon orders from their superiors. 430 F. Supp. 3d at 617. As described above, orders do not insulate Defendants from liability. Additionally, the Amended Complaint, which must be accepted as true, alleges that Defendants arrested Plaintiffs and the other kettled civilians as punishment for actual or perceived criticism of SLMPD.

[10]     Mr. Nelson has no negligent or intentional infliction of emotional distress claims.

**B.  Plaintiffs' state law claims are not barred by sovereign immunity.**

Judges in this district have already addressed the sovereign immunity in cases against the City and found that the facts alleged by plaintiffs in those cases, which are similar to Plaintiffs' allegations, were sufficient to state a claim. *See Laney v. City of St. Louis*, No. 4:18-cv-01575-CDP, ECF No. 34 at 16-17 (citing *Fortenberry v. City of St. Louis*, No. 4:18-CV-01937-JCH, 2019 WL 1242671, at *7 (E.D. Mo. Mar. 18, 2019)). *See also Aldridge v. City of St. Louis, Mo.*, No. 4:18-CV-1677 CAS, 2019 WL 1695982, at *4 (E.D. Mo. Apr. 17, 2019)). Municipalities waive sovereign immunity by purchasing liability insurance that covers the plaintiff's claim. *State v. Rel. Bd. of Trustees of Cty. of Kansas Cty. Mem'l Hosp. v. Russell*, 843 S.W.2d 353, 360 (Mo. 1992). At the pleading stage, all a plaintiff must do is plead specific facts demonstrating his claim falls within an exception to sovereign immunity. *See Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo. Ct. App. 2007) (citing *Hummel v. St. Charles Cty. R–3 Sch. Dist.*, 114 S.W.3d 282, 284 (Mo. App. 2003)).

Here, the Amended Complaint alleges the City obtains insurance from, or is self-insured through, the Public Facilities Protection Corporation ("PFPC"), a not-for-profit corporation into which the City pays funds yearly. Doc. No. 117 ¶ 229-230. These statements alone, which must be accepted as true, are sufficient to state a plausible claim that the City has waived sovereign immunity. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Such an inference is supported by the City's own documentation. The City website's accounting page previously explicitly stated the PFPC is the City's self-insurance program. *See* ECF Doc. 65, Exhibits A-D in *Faulk v. City of St. Louis*, No. 4:18-cv-0308-JCH (E.D. Mo. February 27, 2019). Indeed, City Counselor Julian Bush stated in a January 31, 2018 letter that the PFPC can be "properly thought to be self-insurance." *Id.* Plaintiffs pleaded more than sufficient facts showing that the City obtains insurance from, or is self-insured through, the PFPC, thus waiving sovereign immunity.

**V.      The Court Should Not Decline to Exercise Supplemental Jurisdiction Over Plaintiffs' Vicarious Liability Claims Under the City Charter.**

As Defendants acknowledge, Article VIII, Section 5 of the Charter of the City of St. Louis states that "[e]ach head of a department, office or division shall be responsible for the acts or omissions of officers and employees appointed by him and may require bonds or other securities from them to secure himself." The Court should not decline to exercise jurisdiction over the proposed vicarious liability count because it arises from the conduct giving rise to every other count of the proposed amended complaint.

Plaintiffs recognize that this vicarious liability count presents a novel argument and that no court has addressed it. Defendants claim that the absence of a reported case weighs against Plaintiffs' interpretation. However, Defendants ignore that the more likely reason no such case law exists is that the City of St. Louis only recently wrested control of the St. Louis Metropolitan Police Department from the State of Missouri. Because the State had control of the police department, the issue of City department heads' vicarious liability could not have been asserted or litigated. However novel this argument may be, the fact remains that the clear and plain language of the City Charter imputes personal liability of City employees to the head of each department, office or division employing those people. On September 17, 2017, Defendant Deekens was the Public Safety Director and Defendant O'Toole was the acting Chief of Police. The other individual Defendants worked for Defendants Deekens and O'Toole during the events that give rise to the proposed amended complaint. Accordingly, under the City Charter, Defendants Deekens and O'Toole are personally liable for the acts of their employees. While the courts have never had occasion to address this issue, the City Counselor issued an opinion that confirmed that this Charter provision means that department heads are "personally responsible for the acts or omissions of the subordinates appointed by them."

Defendants claim that cities are not permitted to create causes of action, citing *Yellow Freight Sys., Inc. v. Mayor's Comm'n on Human Rights of City of Springfield*, 791 S.W.2d 382, 386 (Mo. banc 1990). In that case, the court considered whether a city could create its own municipal human rights commission to determine violations of its human rights ordinance. The court found that such an action was only vested in the power of the General Assembly. The City Charter provision, however, does not involve creating an entity to enforce its own ordinances in contravention of state law. *Yellow Freight* addresses a municipality creating a private right of action against a third party. *Id.* at 384. Here, the City's ordinance creates liability to its own department heads. *Yellow Freight* also explicitly acknowledges that an ordinance may establish an element of tortious conduct. *Id.* Defendants do not point to any authority barring it from promulgating such a Charter provision or to any state or federal authority with which this Charter provision conflicts.

Plaintiffs recognize the holding that public officers are not responsible for acts of subordinate officials under state law. *See Davis-Bey v. Missouri Dep't of Correction*, 944 S.W.2d 294, 298 (Mo. App. 1997). Yet, that case does not prohibit a city from creating vicarious liability for municipal employees, as the City Charter has done. The drafters of the City Charter chose to include this provision. It has not been repealed, it is not barred by state or federal law, and no higher government entity has usurped this authority. In fact, the "home-rule" case law cited by Defendants, *Cooperative Home Care, Inc. v. City of St. Louis*, provides that "police power is among those powers incident to a city's affairs, so that charter cities have authority to enact ordinances having a substantial and rational relation to the 'peace, comfort, safety, health, morality, and general welfare' of its inhabitants . . . even though those issues also are addressed by state and national laws." 514 S.W.3d 571, 586–87 (Mo. banc 2017) (quoting *Missouri Dental Bd. v. Alexander*, 628 S.W.2d 646, 650 (Mo. banc 1982)). Thus, the City is authorized to make public safety officials vicariously liable for the tortious and unconstitutional acts of their officers.

It would be nonsensical to argue that the City can promulgate health, safety, and welfare laws for which citizens are held, and simultaneously are that the City is barred from holding its employees accountable under similar laws. The Motion should be denied.

## CONCLUSION

For the reasons stated above, Defendants' Motion should be denied in full.

Date: February 19, 2021                        Respectfully submitted,

KHAZAELI WYRSCH LLC

/s/ Javad Khazaeli
James R. Wyrsch, 53197MO
Javad Khazaeli, 53735MO
Kiara N. Drake, 67129MO
911 Washington Avenue, Suite 211
Saint Louis, MO 63101
(314) 288-0777
(314) 400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com

ARCHCITY DEFENDERS, INC.

Blake A. Strode, #68422(MO)
Maureen G. V. Hanlon, #70990(MO)
John M. Waldron, #70401(MO)
Nathaniel R. Carroll, #67988(MO)
440 N. Fourth Street, Suite 390
Saint Louis, MO 63102
855-724-2489
bstrode@archcitydefenders.org
mhanlon@archcitydefenders.org
ncarroll@archcitydefenders.org
jwaldron@archcitydefenders.org

**Attorneys for Plaintiffs**